IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MARCUS ANTHONY POWELL,

    Petitioner,               No. 2:05-cv-01167 ALA HC

    vs.

RICHARD KIRKLAND,          <u>ORDER</u>

    Respondent.

_____/

    Marcus Anthony Powell ("Petitioner"), a state prisoner proceeding with counsel, has filed an application in this Court for a writ of habeas corpus under 28 U.S.C. § 2254(a). He challenges a conviction entered in the Superior Court of the State of California, County of Sacramento on January 4, 2002. After a jury found Petitioner guilty of first degree murder, attempted murder, and attempted robbery, he was sentenced to 84 years to life in prison. Petitioner contends that his Constitutional rights were violated because he was denied effective assistance of counsel and the evidence presented at trial was insufficient to support the jury's verdict. For the reasons set forth below, his application is DENIED.

**I**

The following statement of facts is taken from the opinion of the California Court of

Appeal:[1]

Vernon Youngblood testified that on May 1, 1999, he and Kenneth Hann hung out at Hann's home in the G Parkway neighborhood of Sacramento. Going out to buy whiskey, they met Alysa, a friend of Youngblood, who invited them to come to her house later. After rolling a marijuana joint for later use, they went to Alysa's house.

Along with Alysa and others, Youngblood and Hann started drinking, smoking, and passing around the joint. They smoked half the joint, then put it aside to save it.

Later, more people arrived, including defendant. Youngblood heard people refer to defendant as "Baby Insane"; he also heard defendant address people as "cuzz" and "[l]occ," which Youngblood took to be gang references.

The people there, including defendant and Youngblood, jointly partook of the remaining marijuana. Youngblood asked defendant about getting more. Defendant asked how much; Youngblood said $10 worth.

Defendant, Youngblood and Hann left together. After walking a few blocks, defendant asked the others to give him their money so he could go get the marijuana. Youngblood refused. Defendant then offered to bring the supplier back to where they were.

Defendant returned five minutes later with another African-American male, who said they could not complete the transaction there because there were too many police around. They all walked toward an alley.

At the head of the alley, defendant demanded the money from Youngblood. Youngblood asked to see the marijuana first. Defendant said: "Break yourself; give me all your money. We ain't playing." He pulled a silver gun from behind his back. Youngblood looked at Hann, then defendant. He heard a boom and saw Hann fall.

Youngblood then saw defendant pointing the gun at him. He saw a spark and heard a boom. Defendant shot him in the chest, damaging his liver and diaphragm. Defendant and his companion fled.

Ruth Rodriguez, who lived on El Limon Court in the G Parkway neighborhood, was standing with a friend just after midnight on G Parkway when she heard two gunshots right in front of her across the street. She saw two young African-American males running from the spot and a third person falling to the ground. One runner was wearing a black jacket, the other purple.

After falling, Hann lay on the ground; Youngblood could not rouse or lift him. Hann later died of his wound.

---

[1] Under 28 U.S.C. § 2254(e)(1), the findings of the state court are presumed to be correct unless rebutted by clear and convincing evidence. Petitioner has not rebutted the state court's finding under this standard.

Youngblood made his way to his godmother's house, where Sacramento Police Officers Matthew Young and Art Smith found him around 1:37 a.m. on May 2. According to Officer Young, Youngblood was upset and excited, but coherent. He said "Baby Insane" shot him. Youngblood described "Baby Insane" as an African-American male, about 18 years old, shorter than his own height of five feet, 10 inches, wearing blue and black clothing, and proceeding on foot. He also said "Baby Insane" went to "Luther" High School and "claimed" 24th Street Crips. (Youngblood did not remember saying these things. He recalled however, that he overheard defendant telling others about his gang membership.)

That night defendant's 15 year-old brother, Calvin Barnes, and his maternal aunt, Cynthia Moore, were at home. Around 1:30 a.m., defendant came in with another African-American male. Defendant asked Cynthia and another aunt if either could give his friend a ride. He told Cynthia there had been a shooting "in the G," at least one person was dead, and the defendant needed to get his folks out of there.

Defendant's mother, Patrice Moore, returned home around 2:00 a.m. Defendant was on the phone. Patrice told him to take his friend out of the house. Shortly afterward, Michael Edwards, a member of defendant's gang, arrived; Patrice told him to take both defendant and his friend away.

Defendant's family had been aware that defendant was involved in gangs. His mother, his aunt, and his brother knew he had recently gotten the numbers "2" and "4," representing the 24th Street Crips, tattooed on his arms. His aunt and his brother knew of his gang moniker "Baby Insane." His aunt knew he socialized with gang members who identified themselves by the color blue.

Defendant's brother, Calvin Barnes, testified that defendant had said he started in a gang at age 13. Sometime before the crimes, Barnes had heard defendant and other gang members talk about killing "slobs" (i.e., members of rival gangs) in the G Parkway area. Barnes had also seen defendant shoot a chrome gun with a black handle. (Barnes admitted he had sometimes lied to his aunt, but denied that he had lied to the police or at trial.)

Sacramento Police Sergeant William Tanton and Sacramento County Probation Officer Brian Casteel, who had gone to the crime scene, arrived at defendant's home just after defendant had left with Michael Edwards. Casteel knew defendant was on juvenile searchable probation. He also knew defendant and Michael Edwards belonged to the 24th Street Garden Blocc [*sic*] Crips, Edwards being known as "Insane" and defendant as "Baby Insane." In a search of defendant's room, Tanton and Casteel found an envelope bearing defendant's name and graffiti saying defendant was "Baby Insane."

Interviewed by Sacramento Police Detective Jeffrey Gardner, Edwards admitted he was known in the gang as "Insane." He identified defendant as a fellow gang member. He told Gardner he had gotten a call from defendant in the early morning

3

of May 2, 1999, asking him for a ride. Edwards met defendant and his companion, who had recently rejoined the gang. Defendant said he had shot two "fools" or "slobs" who had flashed gang signs; defendant called this "[doing] his business." (As we discuss below, Edwards refused to testify at trial despite a grant of use immunity. His statements to Gardner were then admitted through Gardner's testimony for the limited purpose of supporting the testimony of the prosecution's gang expert.)

      Sacramento Police Detective Adlert Robinson testified as an expert witness on gangs. He identified the 24th Street Crips and the Garden Blocc [*sic*] Crips as the same gang, one which claimed the color blue; the 24th Street Crips are a subset of the Garden Blocc Crips, a south Sacramento gang. In May 1999, the Garden Blocc Crips' main criminal activities were selling narcotics, committing assaults with deadly weapons, murder, kidnapping, drive-by shootings, and car theft. Two Garden Blocc Crips had recently been convicted of such crimes, one of assault with a firearm, the other of attempted murder. Defendant was a "validated" member of the gang (i.e., known to the police as such), based on his tattoos, his habit of associating with validated Garden Blocc Crips, his admission of gang membership to relatives, his gang nickname, and his history of arrests for crimes listed in section 186.22.

      Robinson testified that gang members demand "respect" and will retaliate for any perceived disrespect, such as flashing rival gang signs, by means up to and including gunplay. Crips refer to Bloods, members of the main rival gang, as "slobs." The phrase "break yourself" means to turn over your money, to make yourself broke.

      Robinson also testified as to certain writings found in defendant's room during the probation search. He opined that the were "personal notes" or rap lyrics, in either case showing defendant's identification with his gang and his determination to commit crimes on its behalf.

      Finally, Robinson was presented with hypotheticals derived from Youngblood's and Edwards's differing stories about the crimes. He was asked whether under those scenarios the crimes were committed for the benefit of defendant's gang and with the specific intent to promote its criminal activity. He opined that either scenario would show that intent.

      The defense presented three witnesses to impeach the credibility of prosecution witnesses. Sacramento County Sheriff's Deputy Dan Donelli testified that he arrested Vernon Youngblood and others for a robbery at Sunrise Mall in June 2000. Sacramento County Sheriff's Deputy Brant Santin testified that witnesses identified Youngblood as one of the robbers despite his denial. Finally, Patrice Moore testified that her son Calvin Barnes is a habitual liar.

(Resp't's Lodged Doc. No. 4.)

Petitioner was convicted of first degree murder, attempted murder, and attempted robbery. The jury also made a special finding that the crimes were committed "for the benefit of, at the direction of or in association with a criminal street gang, to wit, Garden Blocc [sic] Crips, with the special intent to promote, further and assist in criminal conduct by gang members . . . ." (Rep.'s Rep.'s Augmented Tr. on Appeal, Trial Tr. from Oct. 18, 2001.)

## II

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal habeas corpus relief is not available for any claim decided on the merits by a state court unless its adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if its decision contradicts the governing law set forth in a Supreme Court decision, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result. *Early v. Packer*, 537 U.S. 3, 8 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

A federal court may grant an application for a writ of habeas corpus if the state court identified the correct governing legal principle from the Supreme Court's decisions, but unreasonably applied it to the facts of the case. *Williams*, 529 U.S. at 413. A federal court, however, "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in

its 'independent review of the legal question', is left with a 'firm conviction' that the state court was 'erroneous.'").

A federal court looks to the last reasoned state court decision as the basis for the state court judgment. *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Where the state court reaches a decision on the merits, but provides no reasoning to support its conclusion, a federal court must independently review the record to determine whether habeas corpus relief is available under section 2254(d). *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This review is not de novo. It must be conducted with the deferential standard of review that is mandated by AEDPA. *Delgado*, 223 F.3d at 982. For those of Petitioner's claims for which a state court has provided a reasoned decision, this Court will follow the last reasoned decision rule. For all others, this Court will conduct an independent review of the record to determine whether the California Supreme Court's decision to deny the petition was reasonable.

### III

Petitioner contends that he was deprived of his Sixth Amendment right to effective assistance of counsel at his trial. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court enunciated the standard that must be applied in reviewing a claim of ineffective assistance of counsel. First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *Id.* at 688. To this end, a petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *Id.* at 690. The court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. *Id.*

Second, a petitioner must affirmatively prove prejudice. *Id.* at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

6

In his application, Petitioner asserts that his trial counsel was ineffective in the following respects:

(1) Counsel did not object to the trial court's ruling that the witness, Mr. Edwards, would be put on the stand despite the court's knowledge that he would refuse to testify;

(2) Counsel did not object to "the prosecution's intended use of [Mr. Edwards's] invocation of his rights against petitioner [sic] to support its claim that the crimes at issue were gang related"; and

(3) Counsel did not object to the prosecution's use of Mr. Edwards's out-of-court statement to the police to support an expert's testimony, and the prosecutor's assertion in closing arguments that the crime was gang-related.

(Pet. Writ of Habeas Corpus App. V ¶ 3.)[2]

## A

The prosecution called Mr. Edwards as a witness. Mr. Edwards initially invoked his Fifth Amendment right not to incriminate himself before he took the stand, on the advice of his counsel. The trial court granted Mr. Edwards use immunity. Therefore, the court concluded that he had no right to refuse to testify. When Mr. Edwards took the stand, he refused to answer any of the prosecution's questions. He was held in contempt. The prosecution referred to Mr. Edwards's refusal to testify in his closing argument to support the Government's theory that the crime was gang-related. The Prosecutor stated, referring to defense counsel's closing argument:

> Oh, [defense counsel] mentioned Michael Edwards. He said, what if Michael Edwards didn't want to commit perjury by telling you what he told Officer Edwards [sic].
> How about this? What if Michael Edwards didn't want to testify because he knows he would have screwed his buddy? How about that? How about that? Which do you think is more

---

[2] In the Answer, Respondent addresses only one of Petitioner's ineffective assistance of counsel claims: that the allegation that trial counsel was ineffective for failure to object to the admission of Mr. Edwards's testimony. Petitioner, however, asserts that trial counsel should have objected in three discrete instances. Petitioner exhausted these claims in state court. Therefore, this Court may properly address all three of Petitioner's ineffective assistance of counsel claims. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999) (holding that exhaustion of state remedies in a federal habeas corpus petition is satisfied by completing one full round of review at the state level).

7

      plausible?

(Rep.'s Rep.'s Augmented Tr. on Appeal, Trial Tr. from Oct. 4, 2001.)

      Petitioner maintains that his trial counsel should have objected to the calling of Mr. Edwards as a witness because he was forced to invoke his Fifth Amendment privilege in front of the jury. Petitioner also asserts that counsel should have objected to the prosecutor's reference to Mr. Edwards's refusal to testify in closing arguments. There is no reasoned state court decision on this issue in this matter. Therefore, this Court must conduct an independent review of the record.

      In order to evaluate whether the state court unreasonably applied the *Strickland* standard, federal courts often examine trial counsel's performance in light the facts of the case and the state law relevant to counsel's alleged inferior performance. *See*, *e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 536 (2003) (finding trial counsel's performance deficient in part for failing to present expert testimony that would have been admissible under Maryland state law); *Stenson v. Lambert*, 504 F.3d 873, 889-890 (9th Cir. 2007) (holding that counsel was not ineffective because the theory of the case that the petitioner desired his counsel to follow relied on evidence that would not have been admissible under state law). In the instant matter, this Court must look to the relevant California law to assess whether trial counsel should have lodged the objections that Petitioner alleges.

      Under California law, it is improper to call a witness who has a valid Fifth Amendment claim of privilege during a trial, when the prosecution or court has reason to know that the witness's intention is to invoke his or her right not to incriminate himself. *People v. Lopez*, 71 Cal. App. 4th 1550, 1554 (1999) (citing *People v. Mincey*, 2 Cal. 4th 408, 441 (1992)). However, the court in *Lopez* held that "where a witness has no constitutional or statutory right to refuse to testify, a different analysis applies. Jurors are *entitled* to draw a negative inference when such a witness refuses to provide relevant testimony." *Id.* (emphasis in original). Courts have found the holding in *Lopez* to apply in instances where the court has granted use immunity to a plaintiff under section 1324 of the California Penal Code, as the trial court granted to Mr.

Edwards.³  *See*, *e.g.*, *People v. Fernandez*, No. F045958, 2005 WL 2660057, at *8-15 (Cal. App. 5th Dist. October 19, 2005) (holding that a witness who refused to testify after having been granted immunity under section 1324 was properly called before the jury so that they could witness the refusal; that negative inferences drawn from the refusal to testify were permissible).

Here, Mr. Edwards had no Fifth Amendment privilege to invoke, because he was granted use immunity from the trial judge under California Penal Code section 1324.  Therefore, Mr. Edwards also had no right to refuse to testify.⁴  Accordingly, the trial court correctly allowed the prosecution to call Mr. Edwards as a witness.  *Lopez*, 71 Cal. App. 4th at 1554.  Because the jury is permitted to draw negative inferences from Mr. Edwards's refusal in this instance, the prosecutor did not engage in misconduct when he referenced Mr. Edwards's silence in his closing arguments.  *Id.*  Accordingly, defense counsel's failure to object was reasonable, as the trial court did not err.  Therefore, trial counsel's performance did not fall below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 688.

**B**

Mr. Edwards made statements to Detective Gardner prior to trial.  The prosecution called Detective Gardner to testify about those statements to provide a basis for Detective Robinson's expert opinion.  The trial court instructed the jury that they were to consider Mr. Edwards's statements for the limited purpose of laying a foundation for Detective Robinson's opinions, but not for the truth of those statements.  The prosecutor asked Detective Robinson to express his opinion about hypothetical situations drawn from Mr. Edwards's statements.  Detective Robinson concluded that had the crime occurred as the prosecutor described, such crimes should

---

³ Section 1324 details the process by which a witness who invokes their Fifth Amendment right to remain silent may be granted immunity and thus compelled to testify.

⁴ The trial judge explained to Mr. Edwards and his counsel that Mr. Edwards could not be prosecuted for anything he said on the stand, and, therefore, he had no federal constitutional or statutory right to refuse to testify. (Rep.'s Augmented Tr. on Appeal, Trial Tr. from Oct. 15, 2001.)

9

be considered to have occurred for the benefit of, direction of, and association with a gang.[5]

Peititioner argues that his trial counsel should have objected to the admission of Mr. Edwards's statements to Detective Gardner, and to Detective Robinson 's testimony regarding the robbery and shooting of Kenneth Hann and Vernon Youngblood.  He asserts, citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004), that the introduction of the statements violated his Sixth Amendment right to confrontation.

In *Crawford*, the United States Supreme Court held that out-of-court testimonial statements are not admissible at trial unless the court finds that the witness is presently unavailable to testify in person, and the defendant had adequate opportunity to cross-examine prior to trial.  *Id.*  The California Superior Court provided a reasoned decision on this claim.  It concluded:

> Petitioner's Crawford claim is without merit.  Petitioner claims Edwards's statements were admitted as hearsay and Edwards was not subject to cross-examination.  However, Edwards's statements were *not admitted for the truth of the matter asserted*.  The trial court instructed the jury: "Officer Gardner has testified as to certain statements made by Michael Edwards to him in 1999.  That testimony was offered for a limited purpose and must not be considered by you for any purpose other than the limited purpose for which it was introduced.  Specifically, Detective Robinson rendered an expert opinion, and relied on certain information, including the statements made by Michael Edwards to Officer Gardner in 1999, in formulating that opinion.  You may consider those statements only for the purpose of their being part of the basis of Detective Robinson's opinion.  However, none of the statements of Michael Edwards are being admitted for the truth of the matter asserted therein."  Crawford addressed the issue of the admission of hearsay testimony, which by definition is an out-of-court statement that is offered for the truth of the matter asserted. (See Evid. Code, § 1200(a).) In Petitioner's case,

---

[5]  Detective Robinson testified that the reason this crime should be considered gang activity is as follows:
> [Y]ou have two Crip gang members holding up an individual, and that's what gang members do.  That's one way they -- that's one of the things they do to make their money.
> They do it for a couple of reasons: Make their money; two, it bolsters their reputation.  Like I said earlier, the more crazier [sic] the crime, the more serious the crime, the more their reputation is bolstered.

(Rep.'s Augmented Tr. on Appeal, Trial Tr. from Oct. 11, 2001.)

10

> Edwards's statements were not admitted for the truth of the matter asserted and therefore were not hearsay. Instead, they were offered for the non-hearsay purpose of supporting Robinson's expert opinion. Expert opinions may be based on evidence that is not necessarily itself admissible so long as the material is reasonable relied on by experts in the field in forming opinions. (People v. Gardeley (1996) 14 Cal.4th [sic] 605, 618.) Since Petitioner has cited no authority to support his claim that Crawford precludes the use of out-of-court statements as the basis for an expert opinion, there is no valid reason for granting the petition.

(Resp't's Lodged Doc. No. 10) (emphasis in original).

The Superior Court's finding that the admission of Mr. Edwards's statement did not violate Petitioner's Sixth Amendment rights under the Supreme Court's Ruling in *Crawford* was reasonable. The statement in *Crawford*, as here, was made to a police officer. *Crawford*, 541 U.S. at 38-41. But, the witness's statement in *Crawford* was introduced at trial for the purpose of a factual finding. *Id.* at 40. There, the defendant's wife, Sylvia, "did not testify because of the state marital privilege". *Id.* The state then "sought to introduce Sylvia's tape-recorded statements to the police as evidence that the stabbing was not in self defense." *Id. Crawford* is readily distinguishable. In the instant matter, Mr. Edwards's statements were introduced as a foundation for hypothetical questions presented to Detective Robinson. The trial court instructed the jury that they were not to consider Mr. Edwards's statements for the truth of the matter asserted. Detective Robinson was requested to express his opinion that, had the crimes been committed as described in the hypothetical, they could reasonably be seen as gang activity. The Superior Court, in denying Petitioner's state habeas corpus claim, acted reasonably in deciding that Edwards's statements were not inadmissable under *Crawford* because they were not offered for the truth of the matter asserted.

The Superior Court's decision was not contrary to, or an unreasonable application of *Crawford* or *Strickland*. Thus, this claim is without merit. Since the trial court did not err, there was nothing to which trial counsel should have objected. Therefore, trial counsel's failure to object to the introduction of Mr. Edwards's statements, and Detective Robinson's testimony did not fall below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688.

**C**

In his closing argument, the prosecutor argued that the alleged crimes were gang-related. He argued that Petitioner enlisted the help of a fellow gang member. He also asserted that Petitioner's mother was upset because she did not want gang activity brought into her house. Petitioner argues that counsel should have objected to these assertions on the ground that they relied on Mr. Edwards's statements to Detective Gardner. There is no reasoned state court decision regarding this contention. Therefore, this Court must conduct an independent review of the record to determine whether it is a viable claim.

Each of the prosecutor's statements are supported by the evidence in the record.[6] Because the prosecution did not rely solely on Mr. Edwards's statement, there was nothing to which defense counsel should have objected. Therefore, trial counsel's performance did not fall below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688.

Therefore, the California Supreme Court was reasonable to deny Petitioner's ineffective assistance of counsel claims. As set forth above, upon independent review of the record and review of the last reasoned decision for those claims which the state courts have provided reasoned decisions, this Court is unable to find that Petitioner's trial counsel's performance fell below an objective standard of reasonableness. *Id.* at 688.

**IV**

Mr. Powell also argues that there was insufficient evidence to support his conviction of murder, attempted murder, and robbery, as well as the finding that these crimes were gang related.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

---

[6] For example, Petitioner asserts that the prosecution relied on Mr. Edwards's statement to Officer Gardner to argue that this was a gang crime. (Pet. Writ of Habeas Corpus App. V ¶ 3.) The prosecutor's argument is supported by the testimony of Calvin Barnes. Mr Barnes testified that Petitioner was a member of the 24th Street Crips gang and that he called Mr. Edwards to pick him up on the night of the crime. Mr. Barnes's testimony is also corroborated by the testimony of Petitioner's aunt and mother. They testified that Petitioner arrived at home that night with a friend and that they were aware that Petitioner was a member of a gang.

crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[T]he dispositive question under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982-983 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318). A petitioner in a federal habeas corpus proceeding "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant the writ, the habeas court must find that the decision of the state court reflected an objectively unreasonable application of *Jackson* and *Winship* to the facts of the case. *Id.* at 1275. When the sufficiency of the evidence is challenged by a state prisoner in federal habeas corpus proceedings, a federal court must review the entire record. *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985); *see also Jackson*, 443 U.S. at 318 (explaining that in federal habeas corpus proceedings, federal courts have a duty to review the underlying facts for an insufficiency of the evidence claim as they do for claims relating to an alleged involuntary confession).

It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. If the trier of fact could draw conflicting inferences from the evidence, the reviewing court will assign the inference that favors conviction. *McMillan v. Gomez*, 19 F.3d 465, 469 (9th Cir. 1994). "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." *United States v. Dinkane*, 17 F.3d 1192, 1196 (9th Cir. 1994) (quoting *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991)). A federal court must determine the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16.

Petitioner's sufficiency of the evidence claim was brought to the California Supreme Court on direct appeal. The Supreme Court denied review. The California Court of Appeal

13

provided the last reasoned decision. It held as follows:

> We first consider defendant's contention that the evidence was insufficient to support the judgment. We note first that this claim depends on his contentions that much of the evidence, specifically Edwards's police interview and Detective Robinson's expert testimony so far as it has relied on Edwards's statements, should have been excluded. As we explain below, we find that all of this evidence was properly admitted. Considering that evidence along with the rest, we find it amply sufficient to support the jury's verdict as to all counts and enhancements. Defendant does not argue otherwise.
>     But even if Edwards's interview and the expert testimony in question had been excluded, we would still find the remaining evidence sufficient under the substantial-evidence standard of review. Even without the evidence to which defendant objects, there can be no dispute on this record that defendant and his companion murdered Kenneth Hann and attempted both to murder and to rob Vernon Youngblood, that defendant's companion personally used a firearm to murder Hann, and that defendant personally used a firearm to attempt to murder and rob Youngblood, causing him great bodily injury. Moreover, the testimony of Youngblood and defendant's family members established his gang ties independently of Edwards's statements or Detective Robinson's expert opinion. It is true that the defense offered evidence to impeach Youngblood and defendant's brother Calvin Barnes, but the jury evidently found both credible and we cannot reweigh that finding.

(Resp't's Lodged Doc. No. 4).

Upon conducting an independent review of the record, the Court finds that the California Court of Appeals did not unreasonably apply *Jackson* and *Winship* because the evidence is sufficient to uphold the jury's verdict that Petitioner is guilty of murder, attempted murder and robbery, as well as its conclusion that the crimes were gang-related. Detective Robinson testified that had the crime been committed as presented to him in the hypothetical, it could be considered gang activity. The victim, Petitioner's family, and several police officers testified that Petitioner was a gang member. This testimony is sufficient to establish that Petitioner's crime was gang-related. Moreover, Vernon Youngblood, one of the victims, testified that he saw "Baby Insane (Petitioner's gang name) point a gun straight at [him], and [he saw] a big spark and heard a boom and [his] ears started ringing." (Rep.'s Augmented Tr. on Appeal, Trial Tr. from Oct. 3, 2001.) The Court concludes that the evidence was sufficient to persuade a rational juror that Petitioner was guilty beyond a reasonable doubt.

Accordingly, Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) is DENIED.

///

DATED: June 27, 2008

                                        /s/ Arthur L. Alarcón
                                        UNITED STATES CIRCUIT JUDGE
                                        Sitting by Designation